United States District Court
District of New Jersey

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL COMPLAINT |
| v. | : | |
| MATTHEW CRISAFI | : | Magistrate No. 13-6753 |

I, M. Grossman, the undersigned complainant being duly sworn, state the following is true

and correct to the best of my knowledge and belief.

SEE ATTACHMENT A

I further state that I am a Special Agent with the United States Department of Homeland

Security, Homeland Security Investigations ("HSI"), and that this complaint is based on the

following facts:

SEE ATTACHMENT B

continued on the attached page and made a part hereof.

M. Grossman, Special Agent
Department of Homeland Security
Homeland Security Investigations

Sworn to before me and subscribed in my presence,

October 31, 2013      at      Newark, New Jersey
Date                          City and State

Honorable Joseph A. Dickson
United States Magistrate Judge
Name & Title of Judicial Officer              Signature of Judicial Officer



## ATTACHMENT A

### Count One

### Selling Firearms Without a License

On or about June 26, 2013, in Union County, in the District of New Jersey and elsewhere, defendant MATTHEW CRISAFI, a person who was not a licensed importer, licensed manufacturer, and a licensed dealer, did willfully engage in the business of importing, manufacturing, and dealing in firearms, and in the course of such business did ship, transport, and receive firearms in interstate and foreign commerce, in violation of Title 18, United States Code, Section 922(a)(1)(A).

### Count Two

### Smuggling Goods from the United States

On or about June 26, 2013, in Union County, in the District of New Jersey and elsewhere, defendant MATTHEW CRISAFI did fraudulently and knowingly export and send from the United States, and attempt to export and send from the United States, merchandise, articles, and objects, including firearms subject to sales restrictions and licensing controls under Title 18, United States Code, Section 922(a)(1)(A), and did receive, conceal, buy, sell and in any manner facilitate the transportation, concealment, and sale of such merchandise, articles and objects, prior to exportation, knowing the same to be intended for exportation, in violation of Title 18, United States Code, Section 554(a).

### Count Three

### Conspiracy to Commit Money Laundering

From in or about June 2013 through in or about July 2013, in Union County, in the District of New Jersey and elsewhere, the defendant MATTHEW CRISAFI did knowingly conspire and agree with others to conduct financial transactions affecting interstate commerce which in fact involved the proceeds of a specified unlawful activity, namely the smuggling of firearms from the United States contrary to Title 18, United States Code, Section 554(a), knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of property that was the proceeds of specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i), in violation of Title 18, United States Code, Section 1956(h).

1

## **ATTACHMENT B**

I, M. Grossman, am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations.   I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, and other pertinent items of evidence.   Where statements of others are related herein, they are related in substance and in part.   Because this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know or that other law enforcement agents know concerning this investigation.   Where I assert that an event took place on a particular date, I am asserting that it took place on or about the day alleged.

### Black Market Reloaded and the Tor Network

1. Beginning in or about April 2013, the United States Department of Homeland Security, Homeland Security Investigations, Newark ("HSI") conducted an investigation of illicit sales activity on an underground, internet-based marketplace known as "Black Market Reloaded" ("BMR").
2. The investigation revealed that the BMR website provides a sales platform that enables vendors and buyers who are users of the site to conduct anonymous transactions online involving the sale of a variety of illegal goods, including but not limited to firearms, ammunition, explosives, narcotics, and counterfeit goods. .
3. The basic user interface of BMR resembles those of other well-known online marketplaces, such as Ebay and Amazon.com.   However, unlike mainstream e-commerce websites, BMR is only accessible on the "Tor network," as further described herein.
4. Every computer device on the Internet has an Internet protocol or "IP" address assigned to it, which is used to route Internet traffic to and from the device. Ordinarily, a device's IP address can be used to determine its physical location and, thereby, its user.   The Tor network, however, enables its users to hide their identities, as well as their physical locations.
5. In essence, the Tor is a special network of computers on the Internet, distributed around the world, that is designed to conceal the true IP addresses of the computers on the network and, thereby, the identities of the network's users.
6. Although Tor has known legitimate uses, it is also known to be used by cybercriminals seeking anonymity in their illicit online activities.   Every communication sent through Tor is transferred through numerous relays within the network, and concealed in numerous layers of encryption, such that its users believe that it is virtually impossible to trace the communication back to its true, originating IP address.

2

7. Similarly, Tor enables websites to operate on the network in a way that conceals the true IP addresses of the computer servers hosting the websites, thereby making it extremely difficult to identify the server's physical location.

8. Illicit websites operating on Tor have complex web addresses, generated by a computer algorithm, ending in ".onion."  Websites with ".onion" addresses can be accessed only by using Tor browser software, which may be downloaded by prospective users from the Internet.

9. At all times relevant to HIS's investigation of this matter, BMR maintained a ".onion" web address on the Tor network identified as "http://5onwnspjvuk7cwvk.onion."

## The Bitcoin Payment System

10. The primary form of payment used on the BMR website is a form of digital currency known as Bitcoins.  Bitcoins are an anonymous, decentralized form of electronic currency, existing entirely on the Internet and not in any physical form.  The currency is not issued by any government, bank, or company, but rather is generated and controlled automatically through computer software operating on a "peer to peer" network.  Bitcoin transactions are processed collectively by the computers composing the network.

11. While Bitcoins have known legitimate uses, they are known to be utilized by cyber-criminals given the ease with which they can be used to move money anonymously.

12. Generally, in order to acquire Bitcoins, a user must purchase them from a Bitcoin "exchanger."  In return for a commission, Bitcoin exchangers accept payments of currency in some conventional form (cash, wire transfer, etc.) and exchange the money for a corresponding number of Bitcoins, based on a fluctuating exchange rate.  Exchangers also accept payments of Bitcoin and exchange the Bitcoins back for conventional currency, again, charging a commission for the service.

13. Once a user acquires Bitcoins from an exchanger, the Bitcoins are kept in a virtual "wallet" associated with a Bitcoin "address," designated by a complex string of letters and numbers.  The "address" is analogous to the account number for a bank account, while the "wallet" is analogous to a bank safe where the money in the account is physically located.  Once a Bitcoin user funds his wallet, the user can then use Bitcoins in the wallet to conduct financial transactions, by transferring Bitcoins from his Bitcoin address to the Bitcoin address of another user, over the Internet.

14. BMR's payment system essentially consists of a Bitcoin "bank" internal to the website, where BMR users must hold an account in order to conduct transactions on the site.

15. In order to post listings on the BMR site, a vendor must first establish a seller's profile.  In order to make a purchase from a vendor on the site, a user must establish an account on BMR, and then transfer his Bitcoins to a Bitcoin address associated with the user's BMR account.

3

16. After funding one's account, the user can then make purchases from BMR vendors. When the user purchases an item on BMR, the Bitcoins needed for the purchase are held in escrow in a virtual wallet maintained by BMR pending completion of the transaction.

## Unlawful Activity Committed by Defendant MATTHEW CRISAFI

17. Upon gaining access to the BMR website, HSI identified numerous offerings for the sale of illegal goods, including but not limited to firearms, ammunition, explosives, narcotics, counterfeit goods and fraudulent documents. As further detailed herein, from in or about April 2013, through in or about July 2013, defendant MATTHEW CRISAFI maintained a seller's profile on BMR, which he utilized to advertise the sale of numerous firearms and ammunition.

18. On April 20, 2013, an HSI undercover agent (the "UC") accessed the BMR website on the Tor network and established a user account. The UC subsequently identified a posting on a seller's profile page (later identified as defendant MATTHEW CRISAFI) which advertised the sale of a number of firearms, including a Smith & Wesson Model Bodyguard .380 caliber semi-automatic handgun (the "Smith & Wesson").

19. On May 1, 2013, the UC sent a message to defendant MATTHEW CRISAFI via BMR's private-messaging system to inquire about purchasing the Smith & Wesson. Additionally, the UC inquired whether defendant MATTHEW CRISAFI could ship the firearm to a location outside the United States.

20. From May 1, 2013, through May 18, 2013, the UC and defendant MATTHEW CRISAFI engaged in online negotiations for the sale of the Smith & Wesson. Ultimately, the UC agreed to purchase the Smith & Wesson for the equivalent of $3,300 (U.S.) in Bitcoin. Defendant MATTHEW CRISAFI agreed to ship the firearm to an international location. The UC deposited the Bitcoins into a BMR escrow account pending completion of the transaction.

21. On May 21, 2013, defendant MATTHEW CRISAFI contacted the UC on the BMR site to confirm that he had shipped the Smith & Wesson to an address overseas. Defendant MATTHEW CRISAFI shipped the package via the U.S. Postal Service ("USPS"), and provided the UC with the USPS tracking number for the package.

22. On May 27, 2013, law enforcement representatives seized the package containing the Smith & Wesson. The USPS tracking number on the package matched the number provided by defendant MATTHEW CRISAFI to the UC on May 21, 2013.

23. Defendant MATTHEW CRISAFI was identified by USPS personnel in New Hampshire as the individual who shipped the package believed to contain the Smith & Wesson to an overseas destination on May 21, 2013.

24. Following the sale of the Smith & Wesson, the UC and defendant MATTHEW CRISAFI continued to engage in negotiations for the purchase of additional weapons. Ultimately, defendant MATTHEW CRISAFI agreed to sell three

4

additional firearms to the UC, identified as a Glock Model 26, 9mm caliber semi-automatic handgun (the "Glock"), a KelTec Model P32, .32 caliber semi-automatic handgun (the "KelTec"), and a NORINCO SKS 7.62 semi-automatic rifle (the "SKS"), for a total purchase price of $8,500 (U.S.). Defendant MATTHEW CRISAFI arranged to ship the weapons through New Jersey en route to an overseas location.   Those conversations are further described below.

25. On May 29, 2013, defendant MATTHEW CRISAFI sent the UC a private message which stated, in part, "the possibilities are endless once we do enough business..." Law enforcement has interpreted this to mean that defendant MATTHEW CRISAFI would be willing to sell and ship multiple firearms to the UC overseas as their business relationship progressed.   Furthermore, defendant MATTHEW CRISAFI stated, "[r]egarding AR and long stuff we will have to explore better avenues of shipping for sure," meaning that while defendant MATTHEW CRISAFI would be willing to sell military-style, semi-automatic assault rifles to the UC, the parties would need to take additional precautions during shipment in order to evade detection by law enforcement officials.

26. On May 30, 2013, defendant MATTHEW CRISAFI sent the UC a private message which stated, in part, "I am very confident I can get you a few at a time without raising suspicion," meaning that defendant MATTHEW CRISAFI would be able to safely send small shipments of military-style, semi-automatic assault rifles to the UC overseas without being detected by law enforcement officials.

27. On May 31, 2013, defendant MATTHEW CRISAFI sent the UC a private message which stated, in part, "I would think we can get something sent to like a UPS store or a store that excepts [sic] packages for customer pick up...I will look into .... what is close to them we can get him in an out of without any issue," meaning that defendant MATTHEW CRISAFI intended to send a package to a location in New Jersey where a courier could receive it for discrete transport overseas. Furthermore, defendant MATTHEW CRISAFI stated, "[a]s far as what I have on me, Brand new Glock G26 9mm it's the GEN 4 and subcompact, Ive [sic] got a nice pocket P32 Keltek [sic]...[a]lso have an SKS BRAND NEW just took the cosmoline off of it...[t]his thing has never been fired," meaning that defendant MATTHEW CRISAFI had multiple firearms in his possession which he would be willing to sell to the UC for overseas shipment, including the Glock, the KelTec and the SKS.

28. On June 2, 2013, defendant MATTHEW CRISAFI sent the UC a private message which stated, in part, "[r]egarding price with shipping $6500 will be a deal...[i]f you have more to spend I can throw in the new glock g26 for 9k even...[o]ther than that yes I will create you a custom order with both items and shipping to NJ included," meaning that defendant MATTHEW CRISAFI agreed to sell and ship the KelTec and the SKS to the UC - through New Jersey en route to a location overseas - for the total price of $6,500 (U.S.) in Bitcoin, and that if the UC was interested in purchasing the Glock as well, the total price for all three weapons would be $9,000 (U.S.) in Bitcoin.

29. On June 3, 2013, defendant MATTHEW CRISAFI sent the UC a private message which stated, in part, "[m]y only issues with price is I have to figure in all the fee's [sic] BMR charges along with the variable cost...[t]hen the BTC being still unstable I think I can split the difference at $8500 for all 3...[a]nd you are and will be preferred when it comes to price...I want you to make your customers happy along with a profit," meaning that defendant MATTHEW CRISAFI agreed to sell the Glock, the KelTec and the SKS to the UC for a total of $8,500 (U.S.) in Bitcoin (collectively, the "Second Shipment"), taking into consideration the various fees imposed on sales by BMR, as well as the instability of the actual value of Bitcoins at the time of the sale.

30. On June 5, 2013, defendant MATTHEW CRISAFI sent the UC a private message which stated, in part, "[y]es, Ups I'm sure...I will pack a new suitcase like we talked about...I'd be willing to get into big orders we just need to be careful...[t]here is no telling what the long term can make us, ya know, if this … deal goes smooth why don't we use that method for alot [sic] more...[b]rother we can fit many peices [sic] in a case," meaning that defendant MATTHEW CRISAFI planned to secret the weapons in a suitcase for shipment to New Jersey via the United Parcel Service of America, Inc. ("UPS").   Additionally, pending the success of the Second Shipment, defendant MATTHEW CRISAFI indicated his willingness to engage in future transactions with the UC involving larger shipments of firearms.

31. On June 21, 2013, the UC deposited $3,500 (U.S.) in Bitcoin into a BMR escrow account pending his receipt of the Second Shipment.   Defendant MATTHEW CRISAFI agreed to accept the remaining payment of $5,000 (U.S.) cash via Western Union, as further described below.

32. On June 21, 2013, defendant MATTHEW CRISAFI sent the UC a private message which stated, in part, "I hope you don't have any issues with sending that kind of cash from [overseas]...[w]hen we do this there are certain ways to send to me as I don't have to use ID...Western union has a test question and answer...[y]ou just tell them the receiver has no ID and they will go through the steps," meaning that defendant MATTHEW CRISAFI proposed a method whereby he would not have to show proof of his identity when he appeared at Western Union to collect the remaining payment from the UC for the Second Shipment, thereby minimizing the risk he would be implicated by law enforcement officials in the illicit transaction.

33. On June 25, 2013, defendant MATTHEW CRISAFI provided the UC with the name and address of a co-conspirator who had agreed to receive the $5,000 Western Union payment on his behalf ("CC1").   Defendant MATTHEW CRISAFI directed the UC to send the payment to a Western Union branch located in or about Tarzana, California, where CC1 would provide the necessary answers to the test questions posed as part of Western Union's security protocols.

34. As directed by defendant MATTHEW CRISAFI, on June 25, 2013, the UC sent $5,000 cash via Western Union in New Jersey to CC1 at a Western Union branch in or about Tarzana, California.

35. Surveillance footage and documents recovered from the Western Union branch location in or about Tarzana, California, confirmed that CC1 received the $5,000

6

money transfer from the UC on July 26, 2013.   USPS records confirm that later that day, CC1 purchased four separate money orders, totaling $3,900, at a USPS branch in or about Tarzana, California.   Each money order - containing individual, identifiable serial numbers - listed defendant MATTHEW CRISAFI as the payee.

36. On July 27, 2013, defendant MATTHEW CRISAFI contacted the UC on the BMR site to confirm that on July 26, 2013, defendant MATTHEW CRISAFI had shipped the Glock, the KelTec and the SKS rifle stocks to a location in New Jersey, en route to a location overseas.   Defendant MATTHEW CRISAFI shipped the package via USPS and provided the UC with the USPS tracking number for the package.   Additionally, defendant MATTHEW CRISAFI advised the UC that he would send the barrel for the SKS in a separate package.

37. On July 27, 2013, law enforcement representatives seized the package containing the Glock, the KelTec and the SKS rifle stocks at a location in New Jersey.   The USPS tracking number on the package matched the number provided by defendant MATTHEW CRISAFI to the UC on July 27, 2013.

38. Defendant MATTHEW CRISAFI was identified by USPS personnel in New Hampshire as the individual who shipped the package believed to contain the Glock, the KelTec and the SKS rifle stocks to a location in New Jersey on June 27, 2013.

39. On July 29, 2013, law enforcement representatives seized a second package from defendant MATTHEW CRISAFI containing the barrel for the SKS.

40. USPS records confirm that between June 28, 2013, and July 12, 2013, defendant MATTHEW CRISAFI endorsed and cashed at least two USPS money orders totaling $1,900 at separate USPS locations in New Hampshire and Massachusetts, respectively.   USPS records further confirm that on July 3, 2013, two additional USPS money orders totaling $2,000, each of which listed defendant MATTHEW CRISAFI as the original payee, were deposited into unidentified Bank of America accounts.   The serial numbers on all four USPS money orders matched the serial numbers on the four USPS money orders initially purchased by CC1 on June 26, 2013.

41. A thorough search of relevant law enforcement databases has confirmed that defendant MATTHEW CRISAFI has no active or expired licenses to engage in the business of importing, manufacturing, or dealing in firearms, and has no license authority to ship, transport, or receive firearms in interstate or foreign commerce.

7

*United States District Court*

*District of New Jersey*

UNITED STATES OF AMERICA

WARRANT FOR ARREST

v.

MATTHEW CRISAFI

Case Number: 13-6753

To:   The United States Marshal
and any Authorized United States Officer

**YOU ARE HEREBY COMMANDED** to arrest___MATTHEW CRISAFI_____

**and bring him forthwith to the nearest magistrate to answer a(n)**

_____ Indictment  _____ Information  __X__ Complaint  ____Order of court  _____Violation Notice  ____ Probation Violation

Petition

charging him with (brief description of offense)

```
Selling Firearms Without a License; Smuggling Firearms from the United States;
Conspiracy to Commit Money Laundering, contrary to Title 18, United States Code,
Section 1956(a)(1)(B)(i).
```

In violation of Title _____18_____, United States Code, Sections 922(a)(1)(A), 554(a) and 371

Hon. Joseph A. Dickson_____
**Name of Issuing Officer**

United States Magistrate Judge___
**Title of Issuing Officer**

_____
**Signature of Issuing Officer**

October 30, 2013 / Newark, New Jersey
**Date and Location**

Bail fixed at $ _____ by _____

| RETURN | | |
|---|---|---|
| This warrant was received and executed with the arrest of the above-named defendant at | | |
| _____ | | |
| Date Received | Name and Title of Arresting Officer | Signature of Arresting Officer |
| Date of Arrest | | |

